IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____/
HARVEY SULTZER AS
REPRESENTATIVE OF THE ESTATE OF
SANDRA SULTZER AND INDIVIDUALLY

    PLAINTIFFS,                            **Civil Action No.**

    v.

INTUITIVE SURGICAL, INC.

    Defendant.
_____/

## COMPLAINT

1. Plaintiffs the Estate of Sandra Sultzer and Harvey Sultzer (collectively "Plaintiffs") by and through their attorneys, The Sultzer Law Group, P.C. complains against Defendant Intuitive Surgical, Inc. ("Defendant" or ISI") as follows:

### NATURE OF THE CASE

2. Plaintiffs bring this wrongful death/products liability action to redress severe personal, financial, and emotional injuries suffered by Sandra Sultzer and her husband Harvey when Ms. Sultzer experienced health complications, and ultimately died following a da Vinci surgical robot procedure.

### PARTIES, JURISDICTION AND VENUE

3. Sandra Sultzer, the deceased, was a resident of Florida at all times relevant to this Complaint.

4. Plaintiff Harvey Sultzer is a resident of Florida. Mr. Sultzer brings claims herein individually and as representative of the Estate of Sandra Sultzer.

5. ISI is a Delaware corporation with its principal place of business in Sunnyvale, California.

6. ISI is a publicly traded company on the NASDAQ exchange, with a current market

1

value of more than two billion dollars.

7. ISI designed, manufactured, tested, sold, promoted and labeled the da Vinci surgical robot. ISI also makes and sells numerous electrosurgical instruments used with that robot.

8. The Court has jurisdiction under 28 U.S.C. § 1332 because this lawsuit is between citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of costs and interest.

9. Venue is proper in the Southern District of Florida because Defendant committed tortious acts within the state of Florida and the Southern District of Florida out of which acts these causes of action arise.

## FACTUAL ALLEGATIONS

### A. Introduction

10. The da Vinci robot is a multi-armed, remote controlled, surgical device made by ISI.

11. ISI also manufactures "EndoWrist" instruments for use in surgery by the robot.

12. These instruments consist of forceps, scissors, scalpels and other surgical tools. Some of these instruments use electrical energy to cut and cauterize living body tissue.

13. ISI sells its robots and instruments to hospitals who have no experience in robotic surgery, and who rely on ISI for its expertise. ISI tells both surgeons and hospitals: "The simplest measure of success is procedure volume."

14. Procedure volume is integral to ISI's business model, which it describes as: "Our business model is essentially a 'razor/razor blade' operation. Initially, we sell and install the da

2

Vinci Surgical System into new customer accounts. Once systems are sold into customer accounts, we generate recurring revenue as our customers use the system to perform surgery and, in the process, buy and consume our EndoWrist instrument and accessory products. We also generate recurring revenue from system service."

15.     ISI's business model has been successful. ISI began operations in 1995. By September 30, 2014 it had installed 3,174 robots in hospitals worldwide. Its average selling price for da Vinci systems was $1.47 million for the nine months that ended September 30, 2014. Is product revenue was $1,208 million for than nine months, and instruments and accessories revenue constituted $789.5 million for that period, or more than 65% of its total product revenue, not including another $319 million in "Services" revenue.

16.     Procedure volume increases instrument sales for ISI because most of the instruments it sells are either disposable or "re-posable," meaning they may only be used for a certain number of procedures before they must be replaced. The more procedures, the more instruments ISI sells, the more money ISI makes.

17.     Mrs. Sultzer had a surgery to address her colon cancer performed at Baptist Health Boca Raton Regional Hospital in September of 2021. During the surgery Mrs. Sultzer experienced thermal injury small intestine, causing a perforation which required subsequent medical intervention and caused permanent physical and emotional injuries, and ultimately her death.

18.     Mrs. Sultzer's injury and death is not unique to her. According to SEC filings, ISI is currently named as a defendant in "approximately 93 individual product liability lawsuits filed in various state and federal courts by plaintiffs who allege that they or a family member underwent surgical procedures that utilized the da Vinci Surgical System and sustained a variety of personal injuries and, in some cases, death as a result of such surgery."

19. ISI has also received thousands of injury and defect reports related to da Vinci surgeries. The most dangerous injuries arose from burns to internal organs caused by the discharge of electricity, caused by the robot's instruments inside the patient. Despite the severity and multitude of reports, ISI has systematically underreported these injuries and their seriousness to the FDA.

20. As the reports continued to increase, the FDA finally initiated an investigation in 2013. On July 16, 2013, the FDA issued a warning letter concluding that ISI had concealed information from the FDA, secretly recalled defective parts, and ignored known injuries to patients in its design process of critical da Vinci instruments.

21. The FDA further reported that ISI had received hundreds of complaints and reports between July 2009 and December 2011. The vast majority of these reports concerned a little rubber sleeve placed on the end of certain da Vinci metal instruments, designed as an insulating device to prevent electricity from radiating out. The plastic sleeves were referred to as tip cover accessories. The critical defect consisted of cracks or slits that prevented the tip cover accessories from properly insulating the metal instruments and allowed electricity or sparks to escape, which is known as arcing. Because the arcing usually occurred outside of the surgeon's camera field of vision, blood vessels and organs were burned without the medical team's knowledge.

22. Had ISI safely designed its product so that stray electrical energy would not burn the insides of patients without the knowledge or control of the operating surgeons, the small intestine injury to Mrs. Sultzer would not have happened, and she would not have died. Had ISI adequately warned about the problems with its monopolar scissors, the injuries Mrs. Sultzer sustained would not have happened, and she would not have died. The same is true had ISI properly trained the surgeons. In addition, ISI, through intimidation and market management, bullies hospitals and physicians to purchase and use the robot. ISI's da Vinci was unreasonably dangerous

for use in Mrs. Sultzer's procedure; she was unnecessarily injured and ultimately died as a result.

**B.    ISI's Promises to the FDA**

23.     ISI was formed in 1995. In 1996, ISI first sought FDA permission to advertise its robot for use by surgeons in the U.S. By 1999, ISI sought permission to advertise for gall bladder removal and acid reflux treatment. At that time, ISI assured the FDA that it would provide a "comprehensive training program" for da Vinci users.

24.     Upon further FDA inquiry, ISI promised comprehensive surgical team training marked by consistent assessment performed by experts using documented and specifically developed metrics. Training consisted of four phases. Phase One: distance education followed by a 70-question exam, instructor feedback and remediation. Phase Two: 3-day, whole team, hands-on training course that would require the surgeons to perform the specific surgical skills for a given surgery. The surgeons' skills would be assessed using a Likert rating, and they would also self-assess their ability to perform the procedures. Next, the entire surgical team would work with the expert trainers to create a plan for the next phase: implementation. Phase Three: implementation, which would require the console and patient-side surgeons to advance their surgical skills through intense practice on specific procedures using cadaveric models. Their performance would be compared by ISI against objective metrics and certified for mastery. ISI would also make this assessment data available to the team and the hospital. This phase would also require the incorporation and education of an anesthesiologist before conducting a "dry run." Phase Four: ensure that the surgeon had sufficient information to objectively assess his or her readiness to perform actual, specific procedures. The training program's purpose was to ensure demonstrated mastery of competence in applying surgical skills to procedural applications before surgeons operated unsupervised on live human beings.

25.     With this, the FDA allowed ISI to begin advertising its robot for use in gall bladder

15

removal and Nissen fundoplication.

26. ISI's Gene Nagel, who had no education or experience in medicine or medical training, took charge of the training program in 2001. Nagel substantially reduced ISI's training program without approval and without notifying the FDA. For example, Nagel did away with the objective assessment or surgeon evaluation.

27. In February 2005, ISI sought FDA permission to advertise the da Vinci for gynecologic laparoscopic procedures. Following ISI's representations, the FDA allowed ISI to advertise accordingly.

### C. ISI'S Marketing Tactics

28. ISI's marketing included both direct-to-consumer marketing and marketing by providing promotional materials directly for hospitals to use in advertising to patients.

29. These materials made misleading claims. ISI touted benefits such as significantly less pain, less blood loss, less scarring, shorter recovery time, a faster return to normal daily activities, and in many cases, better clinical outcomes. This, without adequate evidence.

30. ISI's stated: "Clinical studies suggest that the extended capabilities provide by the da Vinci System may help surgeons provide better clinical outcomes that conventional open and minimally invasive surgery allow." But no reasonable evidence existed for this claim, which has proven false.

31. ISI declared that surgeons have direct input on "every surgical maneuver" but that too was not true. The da Vinci system was designed in such a way that cauterizing energy was released in the body without direct surgeon input. ISI did not change its inaccurate statement despite learning of the problems with unintended cauterization of patient organs.

32. ISI's marketing materials, and the marketing materials that ISI provide to hospitals, included citations only up to 2005, even though many published, peer-reviewed studies after 2005

15

showed serious questions about the da Vinci's safety and efficacy.

33. ISI's promotional materials do not disclose that the da Vinci surgery is more expensive than other, safer, forms of surgery.

34. To drive procedure growth, ISI also trained a large section of its sales force in "clinical" sales. These "Clinical Sales Representatives" ("CSRs") were judge and paid not on selling robots, but rather on the extent to which they were able to convince surgeons to use robots. ISI provided CSRs with "case volume goals," which it considered "the only measure of success." ISI paid CSRs using a quota system based on how many procedures were performed in the hospitals to which the CSRs were assigned. CSRs were expected to position themselves as a partner in the development of surgical teams and to develop a clinical plan for each surgical team to make sure they were capable of using the system independently. ISI also expected CSRs to find surgeons who were not planning to use the robot for a given procedure and convince that surgeon to convert the procedure to a robotic one, against the surgeon's initial judgment. ISI also expected its CSRs to make sure that hospitals adopted minimal credentialing requirements, which may interfere with procedure volume.

35. ISI over-promoted its products to gynecologists by minimizing procedural complications.

36. ISI's tactics resulted in placing patients in danger because they were being operated on by inadequately trained surgeons with an unsafe device at a greater cost than safer, more effective alternatives.

### D. ISI's Awareness of Contradicting Literature

37. All along, ISI closely monitored all published academic literature related to the

15

robot. ISI maintained a searchable database of this literature for its own internal use that, upon information and belief, ISI did not share with Trump's hospital, physicians, or healthcare providers.

38.     The literature that was published on da Vinci surgeries did not reliably show that using the robot would provide better patient outcomes or decreased complications. Instead, literature showed that the robot was more costly, did not provide better outcomes, and had a steep learning curve for new robotic surgeons that increased the rate of complications.

39.     A March 2009 study analyzing the first 100 robotic surgeries performed by a single surgeon found that the rate of complications was 15% during the first 20 cases. One of that study's authors was an ISI employee.

40.     A March 2010 study in the European Journal of Obstetric Gynecology and Reproductive Biology found that robotic surgeries were 1,916 more Euros that non-robotic surgeries.

41.     On January 13, 2011, Gynecologic Oncology electronically published a study that found no statistically significant differences between the procedure in terms of operative time, blood loss, and number of lymph nodes received. The study also found that, when "prioritized to severity, major post-operative complications were more frequent in [robot-assisted radical surgery] patients" than the non-robotic procedure's patients.

42.     On May 17, 2011, the Journal of Healthcare Quality electronically published a study by Johns Hopkins University School of Medicine, which concluded that ISI marketing materials "overestimate benefits" and "largely ignore risks" of robotic surgery.

43.     On March 4, 2013, James T. Breeden, the President of the American Congress of Obstetricians and Gynecologists (ACOG), issued a statement on the topic. ACOG said: "While

15

there may be some advantages to the use of robotics in complex [surgeries], especially for cancer operations that requires extensive surgery and removal of lymph nodes, studies have shown that adding this expensive technology for routine surgical care does not improve patient outcomes. Consequently, there is no good data proving that robotic [surgery] is even as good as – let alone better – than existing, and far less costly, minimally invasive alternatives." The Statement also said: "Aggressive direct-to-consumer marketing of the latest medical technologies may mislead the public into believing that they are the best choice…."

### E. ISI Knew of its Instrument Insulation Problems

44. The literature also showed that the insulation ISI used on its electrosurgical instruments was insufficient to reliably prevent electricity from leaking into the body and causing internal burns to patients. Upon information and belief, ISI failed to inform Mr. Sultzer's hospital, physicians and healthcare providers this pertinent information.

45. This was documented in the journal Urology on September 16, 2010; in the American Journal of Obstetrics and Gynecology in August 2011 (noting 80% insulation failures after 10 uses, 32% of instruments suffered insulation failure before 10 uses) – though ISI tells hospitals that its instruments will be safe for the first 10 procedures; and in the Journal of Endourology in September 2011 (under sparking conditions, "thermal injury to tissue is instantaneous, inevitable, and severe." Such electrosurgical injuries "are likely to be both under-recognized and underreported.").

46. ISI failed to incorporate any active electrode monitoring system into its design for the robot.

47. Upon information and belief, ISI failed to warn Mrs. Sultzer's healthcare providers of the need for active electrode monitoring during robotic surgery.

15

48. The most commonly used EndoWrist instrument is the Hot Shears Monopolar Curved Scissors ("Monopolar Scissors"). This instrument is used in virtually all da Vinci surgeries.

49. The use of Monopolar Scissors is so prevalent because it allows doctors to both cut and cauterize tissue during surgical procedures. Cauterization occurs through the application of monopolar electricity. To prevent the electricity from spreading to unwanted areas, the Monopolar Scissors requires the use of the tip cover accessory ("Tip cover"), which is also sold by ISI. The Tip Cover is a sleeve and consists of a silicon or flexible rubber-like material connected to a harder plastic-like tube called an altum. It is placed over the end of the Monopolar Scissors to insulate the instrument's metal parts and allow only the exposed electrode (the scissor blades) to emit electrical current to the intended are designated by the surgeon.

50. Between January 2010 and December 2011, ISI received 134 complaints related to problems with its tip cover accessory, including complaints for arcing through damaged tip covers that caused patient injury.

51. Under 21 CFR § 803.50(b), ISI owed a duty and was responsible at all relevant times "for conducting an investigation of each event and evaluating the cause of the event."

52. On October 10, 2011, ISI sent a letter to certain of its clients with suggestions regarding the use of its Tip Covers. ISI chose not to recall its Tip Covers at that time, and ISI failed to notify the FDA of the problem until April 19, 2013.

53. On December 14, 2012, Surgical Endoscopy published an article called "Instrument Failures for the da Vinci Surgical System: a Food and Drug Administration MAUDE Database Study." That article told of 156 separate "arcing" incidents, 125 of which involved the Monopolar Curved Scissors. The article further noted that these failures are often unreported, so the number "inherently underrepresents the true denominator of instrument errors…."

54. As set forth above, ISI under-reported the adverse events associated with the da

15

Vinci surgical system to the FDA.

55. As a result the MAUDE database did not contain a true representation of the number of injuries and deaths associated with the da Vinci surgical system.

56. Had the MAUDE database accurately reflected the adverse events associated with the da Vinci surgical system, Mrs. Sultzer's doctor would have provided accurate risk/benefit information to her as part of the informed consent process prior to her surgery and Mrs. Sultzer would have opted against use of the da Vinci surgical system.

### F. Plaintiff's Injury

57. Mrs. Sultzer was admitted to Baptist Health Boca Raton Regional Hospital in September 2021 for surgery designed to treat her colon cancer. Dr. Avraham Belizon performed the surgery using a da Vinci surgical robot and accessories designed and manufactured by ISI.

58. Mrs. Sultzer experienced thermal injury to the small intestine, resulting in a perforation. Mrs. Sultzer continued to have abdominal pain and fever after the da Vinci surgery, and additional surgeries were required to close the perforation.

59. Following the September 2021 surgery, Mrs. Sultzer underwent numerous medical procedures because of her injury.

60. The injury suffered by Mrs. Sultzer caused her pain and emotional distress. Mrs. Sultzer incurred expense of medical care, hospitalization, treatment, nursing care and treatment, and the expense of rehabilitative care and treatment.

61. Mrs. Sultzer ultimately died in February of 2022 as a direct and proximate result of the injuries she suffered during the September 2021 da Vinci surgery.

62. Prior to consenting to the da Vinci surgery and because of ISI's inadequate disclosures, Mrs. Sultzer was not aware that the instruments to be used for the surgery had insulation problems that made them more prone to causing unintended burn than traditional

laparoscopic instruments. She was not aware that the da Vinci surgery would subject her to higher complication rates with no demonstrated benefit in outcome. She was also not aware that the da Vinci surgery would be more expensive than the traditional laparoscopic surgery.

### G. FDA Investigation

63. On April 1, 2013 and May 30, 2013, the FDA inspected ISI's facilities. These inspections revealed that the Tip Cover accessory was "adulterated" because the "methods used in, or the facilities or controls used for its manufacture, packing, storage or installation" were not in conformity with "the current Good Manufacturing Practices (CGMP) requirements for devices" mandated by the FDA.

64. ISI did not warn consumers about the inadequacy of its insulation until May 8, 2013. On that day, ISI sent an electronic communication to its customers stating that it "has identified a potential issue with certain versions of its Hot Shears Monopolar Curved Scissors (MCS) Instrument" and that "Certain versions" of those instruments "may develop micro-cracks near the distal (scissor) end of the shaft following reprocessing." ISI admitted that in communication: "This may create a pathway for electrosurgical energy to leak to tissue during use and potentially cause thermal injury." ISI further conceded: "These micro-cracks may not be visible to the user."

65. On May 31, 2013, ISI issued a Class 2 Recall for its 8mm Monopolar Curved Scissors.

## CLAIMS FOR RELIEF

## COUNT I

## NEGLIGENCE

66. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully

15

set forth herein and further allege:

67. Defendant owed Sand Sultzer a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling the da Vinci surgical robot.

68. Defendant failed to exercise such reasonable care under the circumstances and therefore breached this duty by:

 a. Failing to properly and thoroughly test the da Vinci surgical robot before releasing it to the market;

 b. Failing to properly and thoroughly analyze the data resulting from the pre-market tests of the da Vinci surgical robot;

 c. Failing to conduct sufficient post-market testing and surveillance of the da Vinci surgical robot;

 d. Designing, manufacturing, marketing, advertising, distributing, and selling the da Vinci surgical robot to consumers, Plaintiff, without adequate warnings of the significant and dangerous risks of the da Vinci surgical robot, and without proper instructions to avoid the harm which could foreseeably occur as a result of using the da Vinci surgical robot;

 e. Negligently continuing to manufacture, market, advertise, and distribute the da Vinci surgical robot after Defendant knew or should have known of its adverse effects.

69. As a direct and proximate cause of the Defendant's negligence Sandra Sultzer suffered serious and permanent physical and emotional injuries.

70. By reason of the foregoing, Sandra Sulzer died on February 7, 2022.

71. As a further direct and proximate result of the Defendant's negligence as set forth

herein, Plaintiffs incurred expense of medical care, hospitalization, treatment, expense of nursing care and treatment, and expense of rehabilitative care and treatment. Those losses are permanent and Plaintiffs will suffer these losses in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT II

## PRODUCTS LIABILITY – DESIGN DEFECT

72.  Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

73.  At all material times, Defendant engaged in the business of selling, distributing, supplying, manufacturing, marketing and promoting the da Vinci robot and other ISI products that was defective in design and manufacture, and was unreasonably dangerous to patients, including the decedent, Sandra Sultzer.

74.  At all material times, Defendant sold, distributed, supplied, manufactured, marketed and promoted the da Vinci robot.

75.  At all material times, ISI products were expected to and reached consumers in Georgia, including Plaintiff, without substantial change in the condition it was sold.

76.  At all material times, Defendant sold, distributed, supplied, manufactured, marketed and promoted the da Vinci robot in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways that include:

> a. Failing to test the da Vinci Robotic surgery properly and thoroughly before promoting the robotic surgical platform using monopolar current to the

  market;

b.  Failing to analyze properly and thoroughly the data resulting from the premarket tests of the monopolar current, and therefore obtaining FDA approval of the device through fraud;

c.  Failing to report to the FDA, the medical community, and the general public those data resulting from pre- and post-marketing tests, which indicated risks associated with its use;

d.  Failing to conduct adequate post-market monitoring and surveillance of da Vinci related surgical complications;

e.  Failing to conduct adequate analysis of adverse event reports;

f.  Designing, manufacturing, marketing, advertising, distributing and promoting the da Vinci robot without adequate warnings of the significant and dangerous risks of monopolar current and without proper instructions to avoid the harm which was reasonably foreseeable;

g.  Failing to use due care in the design of the da Vinci robot with regard to the insulation and monopolar current;

h.  Failing to conduct adequate intra-operative surveillance and post-operative complication studies to determine the safety of the use of monopolar energy as it relates to the da Vinci robot;

i.  Failing to provide adequate training and information to healthcare providers for the appropriate use of the da Vinci robot;

77. Sandra Sultzer's physician used the da Vinci, including the monopolar current, as instructed by and certified by ISI and in the foreseeable manner intended.

78. The da Vinci was unreasonably dangerous because, as designed, it failed to perform safely when used by Sandra Sultzer's physician.

79. The da Vinci was unreasonably dangerous because, as designed, the risk of serious injury posed exceeded any benefit.

80. At all relevant times, upon information and belief, safer alternative energy modalities existed including bipolar energy and ultrasonic energy.

81. ISI knew or should have known of the defects described above, yet it continued to design, manufacture, market and promote the use of the da Vinci robot so as to maximize sales and profits at the expense of the public health and safety.

82. Sandra Sultzer could not, through the exercise of reasonable care, have discovered the risk of serious injury associated with the da Vinci robot.

83. By reason of the foregoing, Sandra Sultzer died on February 7, 2022.

84. WHEREFORE, Plaintiffs demand judgment against ISI and seek compensatory damages, and punitive damages together with interest, the costs of suit, attorneys' fees, and such other and further relief as the Court deems just and proper.

## COUNT III

### PRODUCTS LIABILITY – FAILURE TO WARN

85. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further alleges:

86. Defendant, as a manufacturer and/or distributor of a medical device, is held to a level of knowledge of an expert in the field.

87. The da Vinci robot was defective and unreasonably dangerous when it left

19

Defendant's possession in that in contained warnings insufficient to alert consumers, including Sandra Sultzer, to the dangerous risks and reactions associated with the da Vinci robot.

88. Moreover, Defendant's warnings were inaccurate, unclear, and/or ambiguous.

89. Sandra Sultzer, individually, and through her physicians reasonably relied upon Defendant's skill superior knowledge and judgment.

90. Sandra Sultzer could not have discovered any defect through the exercise of reasonable care. Had Sandra Sultzer received adequate warnings regarding the risks of the da Vinci robot, she would not have used the drug.

91. By reason of the foregoing, Sandra Sultzer died on February 7, 2022.

92. WHEREFORE, Plaintiffs demand judgment against ISI and seek compensatory damages, and punitive damages together with interest, the costs of suit, attorneys' fees, and such other and further relief as the Court deems just and proper.

## COUNT IV

## LOSS OF CONSORTIUM

93. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

94. At all times relevant, Harvey Sultzer the husband of Sandra Sultzer. As such, he is entitled to his wife's services, support, companionship, affection and consortium.

95. Harvey Sultzer is a veteran of the United States Army. In the years prior to Sandra Sultzer's death, Harvey Sultzer suffered from a disability as a result of an injury to his foot that required surgical screws to treat. As a result, prior to her death, Sandra Sultzer was responsible for Mr. Sultzer's physical care.

96. As a result of the injuries sustained by his wife, and ultimately her death, as alleged above, Harvey Sultzer has lost the services, support, companionship, affection and consortium of

19

his wife, and will continue to lose said services, support, companionship, affection and consortium in the future.  Moreover, as a result of his wife's death, Mr. Sultzer has incurred significant medical expenses for the nursing and treatment that had previously been provided by Mrs. Sultzer.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems just and proper.

## COUNT V

## PUNITIVE DAMAGES

97. Plaintiffs incorporate by reference all other paragraphs of this Complaint as if fully set forth herein and further allege:

98. Defendant knew of the da Vinci robot's defective nature, as set forth herein, but, in conscious and or reckless disregard of the foreseeable harm caused by the robot, continued to design, manufacture, market, and sell it so as to maximize sales and profits at the expense of the health and safety of the public, including Sandra Sultzer.

99. Defendant, to ensure the da Vinci's continued and increased sales, intentionally concealed or recklessly failed to disclose to the public, including Plaintiff, the potentially life-threatening defects of the robot. Defendant failed to provide warnings that would have dissuaded physicians from prescribing and consumers from using the robot. Defendant's failure deprived physicians and consumers the ability to weigh the true risks versus benefits of using the robot.

100. Defendant committed the aforementioned conduct with knowing, conscious, and deliberate disregard for the rights and safety of patients and consumers such as Sandra Sultzer, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish Defendant and deter it from similar conduct in the future.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all counts, as to all issues, so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demands judgment against Defendant on each of the above referenced claims and causes of action as follows:

1. Awarding compensatory damages to Plaintiffs;

2. Awarding punitive and/or exemplary damages, in an amount to be determined at trial;

3. Awarding Plaintiffs' attorney's fees;

4. Awarding Plaintiffsco the costs of the proceedings; and

5. Awarding such other and further relief this Court deems just and proper.

February 6, 2024

By: /s/Jason Sultzer
Jack Scarola
**SEARCY DENNEY SCAROLA BARNHART & SHIPLEY, PA**
2139 Palm Beach Lakes Blvd,
West Palm Beach, FL 33409
(561) 686-6300
 scarolateam@searcylaw.com; jsx@searcylaw.com
Jason P. Sultzer (*pro hac vice* application forthcoming)
**THE SULTZER LAW GROUP, PC.**
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
(845) 483-7100

*Attorneys for Plaintiffs*